**Brenda A. MATLOCK**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.**

No. 1:95–CV–1111.

United States District Court,
E.D. Texas,
Beaumont Division.

April 23, 1996.

Joel Grossman, Waldman, Smallwood & Grossman, PC, Beaumont, TX, for Brenda A. Matlock.

John L. Ross, Harrison Henry Yoss, Thompson Coe Cousins & Irons, Dallas, TX, for National Union Fire Insurance Company of Pittsburgh, Pennsylvania.

### MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

HINES, United States Magistrate Judge.

Plaintiff originally filed suit in the District Court for Jasper County, Texas on November 7, 1995 alleging various claims under Texas statutory and common law. It was removed to this court on December 15, 1995 based upon diversity of citizenship. The parties have consented to disposition before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Pending is defendant National Union Fire Insurance Company's ("National Union's") January 22, 1996 motion for summary judgment, to which plaintiff filed a response February 5, 1996 and defendant filed a reply on February 9, 1996.

### I. Background

In October 1992, plaintiff, an employee of Wal–Mart Stores, settled a Texas workers' compensation matter for a sum certain plus future medical expenses for a period of five years. The Compromise Settlement Agreement ("CSA") provided in part:

FUTURE MEDICAL BENEFITS: The carrier will pay for all reasonable and necessary future hospital and medical expenses, if any, resulting from this injury rendered by or at the direction of Dr. Gerald Davis during the period ending on October 22, 1997.

Plaintiff alleges that at some point following the effective date of the CSA, defendant National Union, the workers' compensation insurance carrier, began denying authorization for medical treatment and prescriptions allegedly provided for under the CSA. Plaintiff filed suit in the First Judicial District, Jasper County, Texas on January 26, 1994 seeking recovery for contractual and extra-contractual damages. That case was eventually settled by means of a Compromise Settlement Agreement and Release ("the Release") on January 16, 1995. The Release provided:

For and in consideration of the payment by National Union of the sum of TWO THOUSAND FIVE HUNDRED NO/100 DOLLARS ($2,500), the sufficiency of which is hereby acknowledged, Matlock agrees to release and does hereby RELEASE, ACQUIT, AND FOREVER DISCHARGE National Union ... from additional responsibility or liability in contract or tort or by statutes and from any and all claims or causes of action, *known or unknown, foreseen or unforeseen, accrued or unaccrued,* of any kind whatsoever, at common law, statutory, or otherwise, contractual or extra-contractual, that Matlock has *or may have,* now *or in the future,* arising directly or indirectly from the CSA existing between the parties, regardless of whether asserted in this lawsuit, but not limited to the release of any cause of action based on or related to Matlock's claims for denial of authorization of medical treatment and failure to pay pharmacy prescription under the terms of the CSA. (emphasis added)

Plaintiff claims that subsequent to the execution of the January 1995 settlement, defendant continued to deny authorization and payment for medical treatments prescribed by Dr. Davis (and by his successor after Dr. Davis retired). Specifically, defendant allegedly denied authorization for a discography. As a result of these alleged continued denials, plaintiff filed the instant suit.[1] Plaintiff

---

1. Defendant has apparently now authorized the discography, and the surgery has been completed. Defendant contends it never denied autho-

rization for the procedure, and argues that plaintiff's initial authorization requests were forwarded by plaintiff to an office in Arkansas al-

asserts causes of action under former article 8307, § 5a of the Workmen's Compensation Law, for breach of the duty of good faith and fair dealing, for violation of the Texas Insurance Code, and for violation of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA).

Defendant filed an answer alleging the affirmative defense of waiver and release. Defendant also counterclaimed for breach of contract (the Release) and for recovery of attorney's fees incurred in bringing its claim for breach of contract.

## II. Summary Judgment Arguments

### A. The Motion for Summary Judgment

Defendant alleges the instant suit is barred by the Release signed in the first state court action. Defendant first notes that a release is a contract subject to the general rules of construction governing contracts. Further, although releases generally cover only claims in existence at the time of their signing, parties are free to draft their release broadly enough to encompass unknown damages or claims that may arise in the future. Defendant argues that the Release unambiguously waives any future claims based on denial of benefits due under the CSA. Having set forth argument relevant to its affirmative defense of waiver and release, defendant then proceeds to argue its entitlement to damages for breach of the Release.

### B. Plaintiff's Response

Plaintiff's response argues alternative theories. The first theory proffered involves the defense of "mutual mistake," although the actual terminology for this defense is nowhere used. Plaintiff argues that neither of the parties to the release intended the Release to preclude actions for future violations of the CSA. The Release "was intended and implemented to release the Defendant from liability for the original breach of the CSA, nothing more. The Defendant was aware of the true intentions of the parties when the release was executed." Plaintiff's Response to Defendant's Motion for Summary Judgment at 3. Plaintiff points to defendant's objective conduct in continuing to make payments under the CSA after the date of the Release as evidence of the parties' mutual understanding as to the scope of the Release. Plaintiff argues that defendant's reading of the release would operate to, in effect, "invalidate and/or void the CSA." *Id.* at 2.

Alternatively, plaintiff argues that there exists an ambiguity in the Release. This argument hinges on the language of the Release rather than on the parties' objective manifestations of intent. Plaintiff argues that the Release contains two terms governing the scope of the release from liability. The first is comprised of the language "any cause of action based on or related to Matlock's claims for denial of authorization of medical treatment and failure to pay pharmacy prescriptions under the terms of the CSA." Plaintiff in essence argues that this provision by its terms limits the release of liability to causes of action which had accrued as of the date of the Release. The ambiguity, plaintiff argues, arises from the simultaneous use of all-encompassing language within the same sentence ("known or unknown, foreseen or unforeseen, accrued or unaccrued" and "[any claim] Matlock has or may have, now or in the future"). Plaintiff argues that under the general rules of contract construction, when there are general statement of coverage and a specific, limiting statement of coverage in the contract, the specific, limiting term should control.[2]

### C. Defendant's Reply

Defendant disputes that its broad reading of the Release effects an invalidation and/or voiding of the CSA. It argues, "National Union still has a legal obligation to honor the provisions of the CSA. Plaintiff, however, has released her right to sue National Union over an alleged failure to pay for particular medical services under the CSA." Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment at 2.

---

though the carrier had relocated to Dallas, Texas.

**2.** *See, e.g., Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133–34 (Tex.1994).

Defendant cites numerous cases in support of its argument that a party's release can, if so drafted, release another from liability for future, unaccrued claims. Defendant also argues the Release's ambiguity is an issue to be determined by the trial court as a matter of law, without reference to extrinsic evidence of the parties' intentions. Because the Release is valid and unambiguous, it should be enforced.

### III. Summary Judgment Standards

Defendant National Union has moved for summary judgment against plaintiff claiming it is not subject to liability due to the Release agreement. Defendant claims the Release provision is not ambiguous, that it is enforceable as a matter of law, and no fact issues remain for trial.

■ Once this initial showing is made, the burden shifts to nonmovant to come forward with competent summary judgment proof showing the existence of some genuine fact issue necessitating trial. *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 585, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, by 'conclusory allegations,' *Lujan [v. National Wildlife Fed'n*, 497 U.S. 871, 871–73, 110 S.Ct. 3177, 3180, 111 L.Ed.2d 695 (1990) ], by 'unsubstantiated assertions,' *Hopper v. Frank*, 16 F.3d 92 (5th Cir.1994), or by only a 'scintilla' of evidence, *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082 (5th Cir.1994)." *Little*, 37 F.3d at 1075.

■ Plaintiff has raised two distinct issues in an effort to create a fact issue. The first issue involves the ambiguity of the Release; however, this is an issue of law for the court to determine and does not involve a factual matter requiring jury consideration. The second matter—mutual mistake of the contracting parties—addresses the threshold issue of whether the parties entered a valid contract, and may involve jury questions. As to this second issue, the court is not to resolve conflicts among the evidence on a motion for summary judgment, but is to view the evidence in the light most favorable to the nonmovant. *Lujan*, 497 U.S. at 888, 110 S.Ct. at 3188; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When the evidence put before the court presents a factual controversy, the motion is resolved in favor of the nonmoving party. *Little*, 37 F.3d at 1075. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### IV. Texas Law Re: Ambiguities in a Contract

#### A. General Principles

The court has not been furnished with any authority indicating that this state's public policy forbids a party's waiving his or her right to bring suit to remedy noncompliance with rights possessed under a workers' compensation compromise settlement agreement, nor has any suggestion been found in the court's independent research that any such authority exists. Therefore, the Release in this case will be interpreted as any other release agreement.

■ Release agreements are contracts and must be construed like all other contracts. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex.1990); *Receiver for Citizen's Nat'l Assurance Co. v. Hatley*, 852 S.W.2d 68, 70 (Tex.App.—Austin 1993, no writ). Thus, whether there exists an ambiguity in the Release is a question of law to be decided by the trial court from the plain language of the document. *National Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex.1995); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If the Release agreement is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *Coker*, 650 S.W.2d at 393.

■ Mere disagreement by the parties as to the meaning of a provision of the release agreement does not create an ambiguity. *REO Indus. v. Natural Gas Pipeline Co.*, 932 F.2d 447, 453 (5th Cir.1991). Only

where there is first a judicial finding that a contract is ambiguous is parol evidence admissible; parol evidence is otherwise inadmissible to "create" an ambiguity in an unambiguous contract. *National Union Fire Ins. Co.*, 907 S.W.2d at 520; *Lewis v. East Texas Fin. Co.*, 136 Tex. 149, 146 S.W.2d 977, 980 (1941). Parol evidence is thus not admissible to show that one party intended something other than what the agreement says. *Cannon v. Pearson*, 383 S.W.2d 565, 570 (Tex.1964).

A contract is ambiguous when its language is subject to two or more reasonable interpretations. *National Union Fire Ins. Co.*, 907 S.W.2d at 520. "A genuine, meaningful uncertainty and ambiguity must exist to render a contract ambiguous, and for a contract to be ambiguous, there must exist a genuine and meaningful uncertainty as to which one of two or more meanings or interpretations is proper." *Newman v. Tropical Visions, Inc.*, 891 S.W.2d 713, 720 n. 1 (Tex. App.—San Antonio 1994, writ denied).

### B. Application

Plaintiff takes the language "denial of authorization for medical treatment" out of context in an attempt to restrict that term to *prior* denials. But when read in context of the sentence the phrase is in no way so limited: "For and in consideration of the payment of National Union of [$2500] ..., Matlock agrees to release ... National Union ... from additional responsibility or liability ... from any and all claims or causes of action ... of any kind whatsoever ... *that*

*Matlock has or may have*, now or in the future, arising directly or indirectly from the CSA existing between the parties, regardless of whether asserted in this lawsuit, including but not limited to the release of any cause of action based on or related to Matlock's claims for denial of authorization of medical treatment and failure to pay pharmacy prescriptions under the terms of the CSA" (emphasis added). When read in this context, it is clear that the language regarding denial of authorization is being used simply as an illustration, fresh in the parties' minds from recent experience, of a type of claim that was to be covered by the Release. While the parties' past experiences involved denial of authorization, the clear terms of the Release dictate that the parties' past experiences were not in any manner to cabin or delimit the category of claims henceforth released.

When so properly read, by reinserting the conveniently omitted phrase "any and all claims or causes of action ... of any kind whatsoever ... *that Matlock has or may have*," the language "any cause of action based on or related to Matlock's claims for denial of authorization of medical treatment and failure to pay pharmacy prescriptions under the terms of the CSA" is wholly consistent with the rest of the sentence. In fact, the so-called "broad" or "general" portion of the statement complements rather than contradicts the portion just extracted by emphasizing that future claims are also released.

In short, the Release is not ambiguous because it is not reasonably susceptible to more than one interpretation.[3]

---

**3.** While most release agreements typically address only claims existing at the time the release is executed, a valid release may encompass unknown damages, results, or claims that may develop in the future. *Anheuser–Busch Cos. v. Summit Coffee Co.*, 858 S.W.2d 928, 933 (Tex. App.—Dallas 1993), *withdrawn in part*, No. 05–92–389, 1996 WL 14061, — S.W.2d —— (Tex. App.—Dallas 1996); *see also Texas City Refining, Inc. v. Universal Oil Prods. Co.*, 681 S.W.2d 303 (Tex.App.—Houston [14th Dist.] 1984). The validity of a release that waives future, unknown claims was recognized as early as 1904 by the Texas Supreme Court in *Quebe v. Gulf, C. & S.F. Ry.*, wherein the Supreme Court commented, "For [plaintiff] to intend to release all cause of action for prospective as well as past and present damage, it was not necessary for him to know

what the future would bring to pass. It is enough if he made a binding contract by which he took the chances of future development." 98 Tex. 6, 81 S.W. 20, 22 (1904) (quotation and citation omitted); *see also White v. Grinfas*, 809 F.2d 1157, 1160 (5th Cir.1987) (refusing to set aside settlement agreement "simply because the parties made a poor prediction").

In addition, to the extent that plaintiff intends to assert she was ignorant or mistaken about the scope of the Release, this argument will be of no avail. *Tobbon v. State Farm Mut. Auto. Ins. Co.*, 616 S.W.2d 243, 245 (Tex.App.—San Antonio 1981, writ ref'd n.r.e.).

For these reasons, neither the fact that the Release was of future effect nor the fact that plaintiff may have misunderstood the terms of

## V. Texas Law Re: Mutual Mistake

### A. General Principles

Plaintiff also argues that the doctrine of mutual mistake comes into operation. This doctrine "mandates that a contract be avoided '[w]here a mistake of both parties at the time the contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances.'" *Williams v. Glash,* 789 S.W.2d 261, 263–64 (Tex.1990) (quoting RESTATEMENT (SECOND) OF TORTS § 152 (1981)). Although the "law of mutual mistake does not ... preclude a person from intentionally assuming the risk of unknown injuries in a valid release," "when [the] parties ... have contracted under a misconception or ignorance of a material fact, the agreement will be avoided." *Id.* at 264.

*Williams* involved the issue of whether the parties to a release intended it to cover an injury that was unknown at the time of the release and which did not manifest itself until after the release was signed. The "mutual mistake" at issue in that case involved an undetected latent injury and the signing by both parties of a release that by its terms potentially covered the injury when *neither* party intended the agreement to cover it. Said the court, "If it can be established that a release sets out a bargain that was never made, it will be invalidated." *Id.* at 265.

When a party seeks to avoid a release on the basis of mutual mistake, that party bears the burden of proof. *deMonet v. PERA,* 877 S.W.2d 352, 357 (Tex.App.—Dallas 1994); *Sweeney v. Taco Bell,* 824 S.W.2d 289, 291 (Tex.App.—Fort Worth 1992, writ denied). Inasmuch as the task of the court upon one party's raising the defense of mutual mistake is not to interpret the language contained in the contract, but, rather, to establish if the contract sets forth "a bargain that was never made," the court may consider extrinsic or parol evidence of the parties' intent. *deMonet,* 877 S.W.2d at 356 & n. 1; *see also Johnson v. Texas Ass'n of School Boards Workers' Compensation Self–Insurance Funds,* 852 S.W.2d 648, 649 (Tex.App.—Eastland 1993, no writ) ("'controlling weight' will no longer be given to the language contained in a release to determine whether the release is valid"); *Williams,* 789 S.W.2d at 264.

"The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent, which would necessitate trial to a jury in all such cases...." *Id.*[4] The court must instead look to objective manifestation of the parties' intent to determine whether the future injuries were mutually intended by the parties to be incorporated in the Release. If the objective evidence "indicates that no release of unknown personal injuries was contemplated, the courts cannot provide intent for them." *Sweeney,* 824 S.W.2d at 292.

The *Williams* court enumerated four factors to consider in inquiring whether the parties' conduct indicates a mutual intent to release unknown personal injuries: (1) the knowledge of the parties at the time of signing concerning the injury; (2) the amount of consideration paid; (3) the extent of the negotiations and discussions as to future injury; and (4) the haste or lack thereof in obtaining the release. *Williams,* 789 S.W.2d at 264.

### B. Application

First, the parties clearly did not contemplate a later violation of the CSA. Second, the original suit was premised on failure of defendant to authorize hospitalization and

---

the release can serve as a basis to invalidate an otherwise unambiguous Release agreement.

4. The *Williams* court advised that the doctrine "must not be routinely available to avoid the results of an unhappy bargain." *Williams,* 789 S.W.2d at 265. It appears that the courts analyzing the mutual mistake defense in release agreement cases have, in fact, given the defense a narrow application. *See, e.g., Crockett v. Bell,* 909 S.W.2d 70 (Tex.App.—Houston [14th Dist.] 1995) (upholding trial court's grant of motion notwithstanding verdict made by party asserting defense of waiver and release). *But cf.* Michael A. Plotz, Comment, *Personal Injury Releases May Be Set Aside Under the Doctrine of Mutual Mistake when the Injury Later Sued for Was Unknown at the Time of Signing: Williams v. Glash,* 789 S.W.2d 261 (Tex.1990), 32 S. TEX.L.REV. 311 (1991) ("Under the *Williams* decision, almost every release will lend itself to the presentation of a fact question to be determined by judge or jury.").

surgery. Subsequent to the filing of the suit, defendant apparently refused to authorize an MRI. Counsel for plaintiff thereafter offered to settle the case for $25,000 for plaintiff's pain and suffering. As noted above, the case ultimately settled for $2,500. It is unlikely that a plaintiff who was seeking $25,000 and who agreed to settle the claim for $2,500 intended to foreclose her option to seek a judicial remedy for any subsequent noncompliance. As characterized by counsel for plaintiff, this sum was solely to compensate plaintiff for harm *already caused* and to smooth over relations: "When plaintiff examined the 'release,' plaintiff[ ] understood and interpreted the instrument as relieving the Defendant for their CSA breach in such a way that they would not be admitting to a breach per se, *but would 'buy the peace' with a token settlement reimbursing the Plaintiff for the hardship caused by Defendant's noncompliance of the CSA.*" Plaintiff's response to Defendant's Motion for Summary Judgment at 7 (emphasis added).

The record is not at all enlightening as to the extent of negotiations and discussions regarding future violations of the CSA and the decision to include a broadly-worded Release in the settlement agreement. Finally, the record is unclear regarding the haste, if any, with which the settlement agreement was signed. Although the original state court case lasted for approximately one year, there is no indication in the record of the precise point at which an actual settlement was discussed and the agreement drafted.

Plaintiff makes much of the fact that defendant continued to make CSA payments after the signing of the settlement agreement. However, defendant counters that under its interpretation of the Release its duties under the CSA were not extinguished; all that was extinguished was plaintiff's right to judicial enforcement. Therefore, the overt act of continuing to make payments under the CSA is not necessarily revealing. In any event, it does defy common sense to think that plaintiff intended to foreclose future judicial intervention in light of perceived long-standing and continuing violations of the CSA by defendant. Similarly, the very fact that plaintiff settled the state court action for

$2,500—despite a $25,000 demand—casts significant doubt on defendant's instant claim that it intended and understood the Release to comprehend within its scope future violations of the CSA.

Plaintiff has raised a genuine issue of fact as to whether the parties mutually intended the Release to cover only defendant's actions occurring prior to the Release date. As a result, plaintiff should be permitted to utilize the doctrine of mutual mistake to convince a trier of fact that the parties mutually agreed to a Release agreement which differed from the one which was ultimately reduced to writing. Such an argument will also be pertinent to plaintiff's defense of defendant's counterclaim for breach of contract.

## VI. Conclusion

Defendant's motion for summary judgment will be denied.