F I L E D
United States Court of Appeals
Tenth Circuit

OCT 9 2001

PATRICK FISHER
Clerk

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

RICKS EXPLORATION, INC.,

Plaintiff-Appellant,

v.

CROSS TIMBERS OIL COMPANY,

Defendant-Appellee.

Nos. 99-6370 and 00-6075
(Western District of Oklahoma)
(D.C. No. 98-CV-1470)

ORDER AND JUDGMENT*

Before **LUCERO**, **McKAY**, and **MURPHY**, Circuit Judges.

I.  INTRODUCTION

Ricks Exploration, Inc. ("Ricks") brought suit against Cross Timbers Oil

Co. ("Cross Timbers") in district court asserting, *inter alia*, various claims

sounding in both contract and tort.  The district court granted summary judgment

in favor of Cross Timbers on each of the contract and tort claims and also

awarded it costs as the prevailing party under Federal Rule of Civil Procedure

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

54(d)(1). Ricks appeals both orders. This court exercises jurisdiction over these appeals pursuant to 28 U.S.C. § 1291 and Federal Rule of Civil Procedure 54(b)[1] and **affirms**.

## II. BACKGROUND

### A. Factual Background

Those facts necessary to provide context to this appeal, stated in the manner most favorable to Ricks as the nonmoving party, are as follows. This litigation centers upon the meaning of an Exploration Agreement entered into between Ricks and Southland Royalty Co. ("Southland"). At the time of the

---

[1]After Ricks filed its notice of appeal in No. 99-6370, this court noted a potential jurisdictional issue and ordered the parties to file supplemental briefs addressing this court's jurisdiction. We noted the district court's grant of summary judgment did not resolve all claims set forth in Ricks' first amended complaint and that, instead, the parties jointly stipulated to the dismissal of the remaining claims without prejudice. Parties may not confer appellate jurisdiction on this court as to claims dismissed on the merits by voluntarily dismissing remaining claims without prejudice. *See Hennigh v. City of Shawnee*, 155 F.3d 1249, 1252-53 (10th Cir. 1998); *Heimann v. Snead*, 133 F.3d 767, 769 (10th Cir. 1998). Both parties filed briefs noting that the district court's Final Judgment and Stipulation of Dismissal contained a Rule 54(b) certification directing entry of final judgment as to the claims dismissed on the merits and finding that there was no just reason for delaying entry of such final judgment. This court has reviewed the record and finds that it fully supports the district court's entry of a Rule 54(b) certification. *See McKibben v. Chubb*, 840 F.2d 1525, 1528-29 (10th Cir. 1988). Accordingly, this court has subject matter jurisdiction pursuant to 28 U.S.C. § 1291. *See Matosantos Commercial Corp. v. Applebee's Int'l, Inc.*, 245 F.3d 1203, 1205 (10th Cir. 2001).

execution of the Exploration Agreement, Southland owned unproven oil and gas leasehold interests covering large tracts of land in Texas County, Oklahoma. Upon learning of Southland's interests in the leaseholds, Ricks approached Southland about the possibility of establishing a drilling program whereby Ricks would drill for gas or oil and, if successful, earn the rights to certain acreage within Southland's leaseholds. In return, depending on whether Southland chose to participate in the drilling of any particular well and the extent of its participation, Southland would retain a twenty percent overriding royalty interest, a fifty percent interest in the well itself, or something in between. After lengthy negotiations and the exchange of numerous drafts, Ricks and Southland reached the agreement embodied in the Exploration Agreement.

The Exploration Agreement identified six different prospect areas, denominated Prospect A through F, within which Ricks could initiate drilling operations. The dispute in this case relates to the rights Ricks acquired based upon its drilling operations in Prospect A.[2] Prospect A is comprised of sections 22, 26, 27, 34, and 35.[3] Under the Exploration Agreement, Ricks was to drill an

---

[2]A pictorial depiction of Prospect A, along with sections 3 and 15, is attached as an appendix to this opinion.

[3]In Texas County, acreage is divided into 640 acre sections. Under the terms of the Exploration Agreement, each section was further broken down into spacing units of 80 acres for oil wells and 160 acres for gas wells.

Initial Test[4] in section 27.[5] If the Initial Test were capable of producing oil or gas in commercial quantities and Southland did not participate in the drilling, Ricks would earn a full interest in section 27 and an assignment of fifty percent of Southland's rights in eight adjacent spacing units. The Exploration Agreement provided that the parties were to reach "mutual consent" as to which eight adjacent spacing units Ricks would earn.

As contemplated by the Exploration Agreement, Ricks ultimately drilled its Initial Test on Prospect A in section 27. Because the Initial Test produced gas in commercial quantities and because Southland had not participated in the drilling of the initial test, Ricks earned 100% of Southland's rights in section 27. In addition, Ricks earned a fifty percent interest in the following eight 160-acre quarter-sections (i.e. gas well spacing units): the southwestern and southeastern

---

[4]Paragraph 2 of the Exploration Agreement set forth the following definitions:

A.  Initial Test - The first well, or substitute therefor (as hereinafter defined), drilled on a Prospect
B.  Development Well - A well drilled on acreage earned by [Ricks] by the completion of an Initial Test
C.  Extension Well - A well drilled on [Southland] acreage that is adjacent to acreage earned by [Ricks] pursuant to Paragraph 8. C. below
D.  Discovery Well - A Development Well or Extension Well that meets the criteria described in Paragraph 12. below

[5]Prospect A is the only prospect in which the Exploration Agreement specifically established where the Initial Test would be drilled.

quarter-sections of section 22, the northwestern and southwestern quarter-sections of section 26, the northwestern and northeastern quarter-sections of section 34, and the northwestern and northeastern quarter-sections of section 35.[6]

The Exploration Agreement also contemplated that Ricks could earn additional acreage by drilling Development Wells on land it earned through the drilling of the Initial Test.[7] Under the provisions of the Exploration Agreement relating to Development Wells, for every Development Well drilled which produces the requisite amount of oil or gas, Ricks "shall have the right . . . to extend the field beyond the limits of the acreage earned by the drilling of a particular Initial Test, one drilling and spacing unit at a time (whether within or outside the boundaries of a Prospect)." In 1997, after Cross Timbers succeeded to Southland's position in the Exploration Agreement, Ricks drilled or participated in the drilling of conforming Development Wells in the northern half of Section 34 and the southern half of section 22.[8] Accordingly, pursuant to the terms of the

---

[6]Section 27, along with each of these eight quarter-sections is shaded dark grey in the pictorial representation of Prospect A attached to this opinion.

[7]*See supra* note 4 (setting forth definition of Development Well).

[8]These wells were conforming Development Wells because they were drilled on lands earned by Ricks through the drilling of the Initial Test. They also qualified as Discovery Wells because they produced the requisite amount of gas during the first three months of production. *See supra* note 4 (defining Discovery Wells).

Exploration Agreement, Cross Timbers conveyed to Ricks a fifty percent interest in the northern half of section 22 and the southern half of section 34.[9]

The trouble at the heart of this dispute began when Ricks asserted the right to drill wells on section 3. Section 3 is outside of Prospect A, lying directly south of Section 34. During a series of discussions in the fall of 1998, representatives of Cross Timbers asserted that the Exploration Agreement prohibited the drilling of wells on section 3 because any such well would not qualify as either a Development Well or a Extension Well.[10] Cross Timbers further indicated that it intended to drill its own well on section 3. For its part, Ricks asserted that paragraph 12 of the Exploration Agreement, the paragraph relating to Extension and Development Wells, gave it the absolute right to extend to the field to spacing

_____

[9]The acreage earned in sections 22 and 34 through the drilling of these Development Wells is identified by the light grey shading in the pictorial representation of Prospect A attached to this opinion.

[10]Cross Timbers advanced the following interpretation of the Exploration Agreement in support of its conclusion that Ricks was not entitled to drill on section 3. The Exploration Agreement defines Development Well as "[a] well drilled on acreage earned by [Ricks] by the completion of an Initial Test." Because none of the land in section 3 was earned by Ricks after the drilling of the Initial Test, a well drilled on section 3 could not constitute a Development Well. Furthermore, the Exploration Agreement defines Extension Well as "[a] well drilled on [Cross Timbers] acreage that is adjacent to acreage earned by [Ricks] pursuant to Paragraph 8. C. [*i.e.*, those provisions of the Exploration Agreement relating to the drilling of the Initial Test]." Cross Timbers asserted that wells drilled on section 3 would not qualify as Extension Wells because no part of section 3 was "adjacent" (*i.e.*, contiguous) to any of the acreage Ricks earned upon the drilling of the Initial Test.

units both inside and outside of Prospect A as necessary to fully develop any gas or oil field discovered through its drilling operations.[11]

**B. Procedural Background**

On October 20, 1998, Ricks filed a complaint in district court seeking the following two forms of declaratory relief: (1) a declaration that the Exploration Agreement gave it the right to drill a well on section 3; and (2) a declaration that Cross Timbers had elected not to participate in the drilling of the well in section 3 proposed by Ricks. Two days later, Ricks filed a motion for a preliminary injunction, asking the district court to enjoin Cross Timbers from drilling its own proposed well in section 3. After the district court denied Ricks' request for a preliminary injunction, Ricks filed an amended complaint asserting, *inter alia*, two contract claims and four tort claims.[12] In its contract-based causes of action,

_____

[11]Paragraph 12 of the Exploration Agreement provides, in relevant part, as follows:

> As to any Development Well or Extension Well (as defined below) drilled pursuant hereto that averages 50 BOPD and/or 200 MCFPD during the first three (3) months of production (a "Discovery Well"), [Ricks] shall have the right, but not the obligation, to extend the field beyond the limits of the acreage earned by the drilling of a particular Initial Test, one drilling and spacing unit at a time (whether within or outside the boundaries of a Prospect). [Southland] shall have the right to participate in any well drilled on the extended acreage (an "Extension Well") with up to 50% of its interest in the extended acreage. . . .

[12]For the first time in its amended complaint, Ricks asserted that an identical dispute existed between the parties as to the rights to drill in section 15,

Ricks asserted as follows: (1) Cross Timbers had breached the Exploration Agreement by refusing to recognize Ricks' exclusive right to drill in sections 3 and 15; and (2) assuming the Exploration Agreement as drafted did not give Ricks the exclusive right to drill in sections 3 and 15, the contract should be reformed on the ground that it contained a mutual mistake. Ricks further alleged the following four tort-based causes of action: (1) Cross Timbers had breached its fiduciary duty to Ricks by hindering Ricks' ability to earn additional acreage under the Exploration Agreement; (2) Cross Timbers' drilling activities in section 15 amounted to a bad faith trespass; (3) Cross Timbers' conduct with regard to sections 3 and 15 violated the implied covenant of good faith and fair dealing; and (4) Cross Timbers had tortiously interfered with Ricks' prospective economic relationships.

After Ricks filed its amended complaint, both parties filed cross motions for summary judgment. In their respective motions for summary judgment, each party asserted that the Exploration Agreement was unambiguous. For its part, Ricks asserted paragraph 12 of the Exploration Agreement established its own definition of an Extension Well, independent of the definition set out in paragraph 2(c), and that the definition in paragraph 12 did not contain an adjacency

---

the section immediately to the north of section 22. In fact, at the time of the filing of the amended complaint, Cross Timbers had already drilled two gas wells in section 15.

limitation.  Ricks further asserted that its reading of paragraph 12 was supported by the circumstances surrounding the formation of the Exploration Agreement.  In any event, Ricks asserted that even assuming the adjacency limitation set out in paragraph 2(c) did apply to paragraph 12, adjacent does not necessarily mean contiguous or touching.[13]  In its separate motion for summary judgment, Cross Timbers asserted that unless the definition of Extension Well in paragraph 2(c) of the Exploration Agreement applied to paragraph 12, it would not apply anywhere in the agreement because paragraph 12 was the only portion of the Exploration Agreement dealing with Extension Wells.  Cross Timbers further asserted that the four corners of the Exploration Agreement and the circumstances surrounding its formation, considered either singly or in combination, demonstrated that the adjacency requirement set out in paragraph 2(c) required that Extension Wells only be drilled on land contiguous to acreage earned by the drilling of the Initial Test.  Finally, Cross Timbers asserted that Ricks' mutual mistake claim failed because the Exploration Agreement was unambiguous and that each of Ricks' tort claims failed because the agreement did not create a fiduciary relationship and did not provide Ricks any rights in sections 3 and 15.

---

[13]Although Ricks did assert in its summary judgment motion that the Exploration Agreement was unambiguous, it did hedge that assertion in a footnote where it stated as follows: "If the Court finds Cross Timbers' interpretation reasonable . . . then the agreement is ambiguous."

Upon consideration of the parties' submissions, the district court granted summary judgment in favor of Cross Timbers. As to the contract claim, the district court concluded that language of the Exploration Agreement, considered in light of the circumstances surrounding its execution, unambiguously required that Extension Wells be drilled on lands contiguous to lands earned through the drilling of the Initial Test. Because it concluded that the Exploration Agreement was unambiguous, the district court concluded that the doctrine of mutual mistake was inapplicable as a matter of law. Finally, as to Ricks' four tort-based causes of action, the district court concluded as follows: (1) Ricks' claims of breach of fiduciary duty failed because the Exploration Agreement did not create a joint venture so as to give rise to any fiduciary duties on the part of Cross Timbers; (2) Ricks' trespass claim failed because Ricks had no rights to sections 3 and 15 under the Exploration Agreement; (3) Ricks' claim regarding the covenant of good faith and fair dealing failed because Oklahoma courts would not extend the duty of good faith to commercial contracts and, in any event, the conduct at issue here amounted to no more than a simple breach of contract insufficient to support to support a claim for breach of the implied covenant[14]; and (4) Ricks' claim of

---

[14]In so concluding, the district court noted that its ruling did not preclude Ricks from pursuing a "breach of contract claim arising from these asserted facts; the Court's decision in connection with Claim Five is limited solely to Ricks' *tort* claim for breach of the implied covenant of good faith and fair dealing."

-10-

tortious interference with prospective economic advantage failed because it did not come forward with any evidence of actual loss of economic opportunities and because Cross Timbers merely engaged in conduct to further its own legitimate business and financial interests.

## III. STANDARD OF REVIEW

This court reviews a grant of summary judgment *de novo*, applying the same legal standard utilized by the district court. *See Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1297-98 (10th Cir. 2001). We also review *de novo* the district court's interpretation of the law of Texas, which governs Ricks' contract claims, and the law of Oklahoma, which governs Ricks' tort claims. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) ("[A] court of appeals should review *de novo* a district court's determination of state law."). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). This standard requires that we view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Commercial Union*, 251 F.3d at 1298.

## IV. DISCUSSION

### A. Contract Claims[15]

#### *1. Contract Interpretation*

On appeal, Ricks presents a two-pronged attack on the district court's grant of summary judgment in favor of Cross Timbers on the question of whether the adjacency requirement in paragraph 2(c) applied to paragraph 12.[16] First, Ricks asserts that paragraph 12 of the Exploration Agreement incorporates its own definition of Extension Well, wholly independent of the definition of Extension Well in paragraph 2(c), and that the definition of Extension Well in paragraph 12 does not contain an adjacency limitation. According to Ricks, its interpretation of the Exploration Agreement is borne out by an analysis of the circumstances surrounding the formation of the Exploration Agreement, particularly the numerous draft agreements and letter of intent exchanged by the parties before the Exploration Agreement was finally executed. Second, Ricks asserts that to the

---

[15]The Exploration Agreement contains a clause providing that it "shall be governed by and construed in accordance with the laws of the State of Texas." In light of this provisions, the parties have agreed throughout this litigation that Texas law governs the resolution of the contract claims.

[16]Ricks does not contend on appeal that the district court erred in setting forth the relevant Texas law with regard to the construction of contracts. In fact, throughout this litigation, the parties have agreed in all material respects as to the contours of the law of Texas but have simply disagreed as to the proper interpretation of the Exploration Agreement in light of applicable Texas law.

extent that its interpretation of the Exploration Agreement is not the only reasonable interpretation, the Exploration Agreement is ambiguous.[17]

Upon conducting a *de novo* review of the district court's order, the parties' briefs and contentions, and the entire record on appeal, we are in substantial agreement with the district court's analysis of the Exploration Agreement and see no need to repeat that analysis. Accordingly, this court affirms the district court's grant of summary judgment in favor of Cross Timbers on the contract interpretation claim for substantially those reasons set out in the district court's order. In so doing, we specifically note that the Exploration Agreement cannot reasonably be read as setting forth two separate definitions of Extension Well. Like the district court, this court concludes that Ricks' interpretation of paragraph 12 reads paragraph 2(c) out of the Exploration Agreement. Finally, the circumstances surrounding the formation of the Exploration Agreement, including

---

[17]Before the district court, Ricks' ambiguity argument took the following two forms: (1) Ricks' primary argument was that its interpretation of the Exploration Agreement as setting forth two complementary definitions of Extension Well was a reasonable interpretation and that, assuming Cross Timbers' contrary interpretation of the Exploration Agreement was also reasonable, the agreement was ambiguous; and (2) secondarily, Ricks asserted that the meaning of the term "adjacent" in paragraph 2(c) was ambiguous in that it could mean either "contiguous" or "near to." Ricks did not, however, reassert the second ambiguity argument in its brief on appeal. Furthermore, during oral argument Ricks' counsel conceded that the extrinsic evidence in this case indicates that the parties viewed the term "adjacent" as meaning "contiguous" or "abutting." Accordingly, we do not consider this second aspect of Ricks's ambiguity argument in resolving this appeal.

the numerous drafts exchanged by the parties, do not alter our conclusion that the definition of Extension Well set out in paragraph 2(c) applies to paragraph 12.

### 2. *Mutual Mistake*

The district court rejected Ricks' claim of mutual mistake, ruling as a matter of Texas law that the doctrine of mutual mistake is unavailable when the agreement at issue is unambiguous. In reaching that conclusion, the district court relied on the opinion of the Court of Appeals of Texas in *Baldwin v. New*, 736 S.W.2d 148, 153 (Tex. App. 1987) ("[W]hen an agreement is unambiguous, the defense of mutual mistake as to the meaning of the terms used is unavailable as a matter of law."). On appeal, Ricks argues that the district court erred in relying on *Baldwin* because *Baldwin* is contrary to the subsequent decision of the Texas Supreme Court in *Williams v. Glash*, 789 S.W.2d 261 (Tex. 1990).

In *Williams*, the Texas Supreme Court held that a litigant could seek to rescind a personal injury release on the ground of mutual mistake, despite the unequivocal and unambiguous nature of the release. *See id.* at 264-65. According to the *Williams* court,

> When mutual mistake is alleged, the task of the court is not to interpret the language contained in the release, but to determine whether or not the release itself is valid. We overrule [one of our own decisions] and disapprove [a decision of the court of appeals] to the extent that they give controlling weight to the language of the release to defeat a claim of mutual mistake.

*Id.* at 265. The *Williams* court was careful, however, to note the very narrow nature of the doctrine of mutual mistake:

> The doctrine of mutual mistake must not routinely be available to avoid the results of an unhappy bargain. Parties should be able to rely on the finality of freely bargained agreements. However, in narrow circumstances a party may raise a fact issue for the trier of fact to set aside a release under the doctrine of mutual mistake.

*Id.* at 265; *see also Matlock v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 925 F. Supp. 468, 474 n.4 (E.D. Tex. 1996) (noting that, following the decision in *Williams*, Texas courts have applied the doctrine of mutual mistake narrowly). Furthermore, "[t]he question of mutual mistake is determined not by self-serving subjective statements of the parties' intent, which would necessitate trial to a jury in all such cases" but, instead, by objective manifestations of the parties' intent. *Id.* at 264, 265.[18]

---

[18]In that regard, the facts of the case are particularly telling.

Margaret Williams ("Williams") was a passenger in her family car when it was struck from behind by a car driven by . . . Stephen Glash. While damage to [Williams'] car was apparent at the time of the accident, there were no observable injuries. Williams immediately contacted State Farm Mutual Automobile Insurance Company, Glash's insurer, who advised Williams to bring the car to its local office for an appraisal of the property damage claims. State Farm estimated the cost of repairs at $889.46 and provided Williams a check payable for that precise amount.

At the State Farm office, Williams was asked to complete a claim form containing a question as to whether anyone had been injured by the accident. She checked "No" in response. There was no negotiating or bargaining for release of a personal injury claim; only property damage to the car was discussed. Nonetheless, the

On appeal, Cross Timbers asserts that the decision in *Williams* is inapplicable to this case because *Williams* involved an attempt to rescind a contract, while in this case Ricks attempts to reform a narrow term of the Exploration Agreement in a manner consistent with its litigation position. This court concludes that it need not decide whether *Williams* applies outside of the recision context because, even assuming it does apply, the district court's grant of summary judgment in favor of Cross Timbers on Ricks' mutual mistake claim is still proper. *See Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1233 (10th Cir. 2000) ("[T]his court can affirm the district court for any reason that finds support in the record.").

<hr>

back of the check contained language purporting to release personal injury claims, providing that:

> The undersigned payee accepts the amount of this payment in full settlement of all claims for damages to property and for bodily injury whether known or unknown . . . .

This release language was never explained to nor discussed with Williams or her husband. The face of the check contained a State Farm code, "200-1," denoting the settlement of a property claim, rather than a separate code used by the insurer for personal injury claims. [Williams] subsequently endorsed the check over to the garage that repaired [her] car.

Williams was later diagnosed as having temporomandibular joint syndrome ("TMJ"), causing head and neck pain, as a result of the accident. Both the trial court and the court of appeals found that suit for this injury was barred by execution of the release.

*Williams v. Glash*, 789 S.W.2d 261, 263 (Tex. 1990).

In support of its claim of mutual mistake, Ricks relies on testimony it adduced from the negotiators of the Exploration Agreement as well as the various proposals exchanged by the parties and the letter of intent. The opinion in *Williams* makes clear, however, that "subjective statements of the parties' intent" will not be considered by the court in determining whether sufficient evidence of mutual mistake exists to send the case to a jury. 789 S.W.2d at 264. Accordingly, the only relevant evidence identified by Ricks is the various proposals and the letter of intent exchanged by the parties. This court has closely reviewed the contents of the various proposals and the letter of intent and concludes that evidence is not sufficient to send the case to a jury under Texas' "narrow" doctrine of mutual mistake. *Williams*, 789 S.W.2d at 265. Unlike the situation in *Williams*, where there had not been any discussion at all as to the question of personal injuries, the various proposals exchanged by the parties here demonstrate ongoing negotiations over the breadth of Ricks' right to drill. Furthermore, when Southland proposed adding the adjacency limitation set out in paragraph 2(c) of the Exploration Agreement, it specifically brought the definitions to the attention of Ricks' and asked Ricks' negotiator to look over the definitions and determine whether they accurately reflected the parties' agreement. Without any objection from Ricks, the adjacency limitation was incorporated into the executed Exploration Agreement. Finally, it is clear and

undisputed from the record that the negotiations between the parties were extensive and that the Exploration Agreement was not reached in haste. *See Williams*, 789 S.W.2d at 264 (noting that the extent of negotiations and the haste or lack thereof in reaching the agreement are among the objective factors to be considered in determining whether a claim of mutual mistake should proceed to trial).

Because Ricks has not come forward with any objective evidence indicating that the adjacency requirement was added to the Exploration Agreement by the mutual mistake of the parties, the district court correctly granted summary judgment to Cross Timbers on this claim.

## B. Tort Claims[19]

### 1. Trespass

In its first amended complaint, Ricks alleged that under the Exploration Agreement it had the exclusive right to drill wells in Sections 3 and 15. It further alleged that by drilling its own wells in those two section, Cross Timbers had engaged in a tortious, bad faith trespass. In granting summary judgment in favor of Cross Timbers on this claim, the district court concluded that because the

---

[19]In contrast to the contract claims discussed above, Ricks' tort claims are governed by Oklahoma law.

Exploration Agreement did not bestow on Ricks any right to drill in Sections 3 and 15, Ricks' trespass claim must necessarily fail.

On appeal, Ricks asserts that "the district court simply failed to recognize that, under the Exploration Agreement, only Ricks had the right to drill wells." Accordingly, Ricks asserts that if this court reverses the district court's resolution of its contract claims, we should also reverse the district court's grant of summary judgment in favor of Cross Timbers on the trespass claim. As this court has affirmed the district court's resolution of Ricks' contract claims, we likewise affirm the district court's resolution of Ricks' trespass claim.

### 2. Fiduciary Duty

Paragraphs 44 and 45 of Ricks' first amended complaint provide as follows:

> 44. By virtue of the special relationship between the parties arising from their joint venture, their [co-tenancy] and/or their operator/non-operator relationship, Cross Timbers owed Ricks fiduciary duties to cooperate with Ricks in its efforts to drill wells and earn acreage under the Exploration Agreement.

> 45. By its intentional and malicious actions designed to limit Ricks' ability to earn further acreage, Cross Timbers has damaged Ricks and is liable to Ricks for all actual damages caused by Cross Timbers' breach of fiduciary duty, and for punitive damages.

In granting summary judgment in favor of Cross Timbers on this claim, the district court first noted that the explicit language of both the Exploration Agreement and the Model Form Operating Agreement, attached to and made a part of the Exploration Agreement, specifically negated the existence of a joint

venture. Citing controlling Oklahoma law, the district court further concluded that neither the parties' status as co-tenants as to certain leases nor Cross Timbers' status as operator of certain wells on sections 3, 15, and 22 imposed upon Cross Timbers a fiduciary duty to help Ricks drill as many wells as possible under the Exploration Agreement, the only breach of fiduciary duty claim set forth in the first amended complaint. *See Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350, 1353 (Okla. 1988) (recognizing that although joint tenants cannot actively mislead each other regarding matters relating to the joint estate, the relationship between joint tenants is not fiduciary); *Leck v. Cont'l Oil Co.*, 800 P.2d 224, 228-29 (Okla. 1989) (recognizing the existence of a fiduciary-type relationship between unit operators on the one hand and royalty owners and lessees on the other hand, but noting that the fiduciary obligation of the unit operator was limited to the duty to conduct operations in a prudent manner).

In light of this court's conclusion that the Exploration Agreement did not grant Ricks the right to drill additional extension wells on lands that did not abut lands earned through the drilling of the Initial Test, Ricks' claim that Cross Timbers was under a fiduciary duty to help it drill wells on sections 3 and 15 necessarily fails. Ricks nevertheless argues on appeal that the district court erred "in apparently concluding that Ricks' claim did not involve correlative rights and prudent operations, the limited fiduciary duties Oklahoma law imposes upon

operators." *Cf. Leck*, 800 P.2d at 228-29. We disagree and conclude that the district court properly avoided resolution of such claim because it is not set forth in Ricks' first amended complaint.

It is quite true that Ricks' first amended complaint does contain numerous allegations relating to Cross Timbers' operation of two wells in the southwest quarter section of section 22. All of those allegations, however, related to Ricks' claim that Cross Timbers had manipulated production from the wells it operated in section 22 in an effort to prevent Ricks from learning that the Tarrant 2-22 well was a Discovery Well, thereby entitling Ricks to extend the field into section 15.[20]

---

[20]Paragraphs 17 and 23 through 30 of the first amended complaint allege as follows:

> 17. Since filing the original Complaint, Ricks has learned that Cross Timbers has been and is intentionally and maliciously undertaking numerous improper and unprivileged efforts directed toward the internally-admitted purposes of [a] forcing Ricks to modify the Exploration Agreement and [b] delaying Ricks' development efforts in order to limit Ricks' ability to earn acreage under the Exploration Agreement.
> . . . .
> 23. Under the Exploration Agreement, if one of the wells drilled under the Exploration Agreement - the Tarrant 2-22 well - qualified as a discovery well, then Ricks would earn the right to drill in acreage including Section 15, Township 6N, Range 15E, Texas County, Oklahoma ("Section 15").
> 24. As operator of the Tarrant 2-22 well, a "Development Well" under the Exploration Agreement, Cross Timbers refused to timely commingle production from two formations in the well so that the well's status as a "Discovery Well" would not be apparent.
> 25. At the same time, Cross Timbers also failed to give Ricks

-21-

Both the district court and this court have resolved this claim by concluding that because the Exploration Agreement did not give Ricks any rights to section 15, Cross Timbers was under no fiduciary obligation to help Ricks' drill in that

complete production information from the Tarrant 2-22 well so that Ricks was unaware that the well qualified as a Discovery Well. The incomplete information given Ricks by Cross Timbers' affiliate made it appear that the Tarrant 2-22 well was not a Discovery Well.

26. Before Ricks discovered that the Tarrant 2-22 well was a "Discovery Well," Cross Timbers drilled two wells in Section 15 without seeking Ricks' consent to drill the wells and without offering Ricks an opportunity to participate in the wells.

27. Before first drilling in Section 15, Cross Timbers falsely reported that its targeted depth was a depth in which Ricks had no interest under the Exploration Agreement.

28. The Tarrant 2-22 well's status as a "Discovery Well" gave Ricks' rights to drill and earn acreage in particular formations, including the Council Grove, in certain sections including Section 15.

29. Discovery has revealed that, long before reporting the false depth in Section 15, and contemporaneously with learning that the Council Grove formation was promising in the Tarrant 2-22, Cross Timbers decided to drill to the Council Grove formation in Section 15 without recognizing Ricks' rights in the unit.

30. Also in relation to the Tarrant 2-22 well drilled in the SW/4 of Section 22, Cross Timbers proposed and drilled a second gas well in the same quarter section. Cross Timbers decided not to pursue the natural development into the N/2 of Section 22 intentionally, imprudently and maliciously in an effort to preserve an argument that its tortured construction of the Exploration Agreement would allow it to claim that Ricks still had no rights in Section 15 even if this increased density well was a "Discovery Well."

When these allegations are read in concert with paragraphs 44 and 45 set forth in the text of this opinion, it becomes absolutely clear that the first amended complaint does not set forth a claim of breach of fiduciary duties flowing from Cross Timbers' failure to protect Ricks' correlative rights in section 22.

section.  Although Ricks' motion and brief in opposition to Cross Timbers' motion for summary judgment do appear to hint at the possible existence of fiduciary duty claim of the type discussed in *Leck*, Ricks cannot rightfully complain that the district court failed to resolve a claim never set forth in the first amended complaint.

### 3.  *Implied Covenant of Good Faith*

Relying on many of the same allegations set out above with regard to its fiduciary duty claim, Ricks alleged in its first amended complaint that "Cross Timbers' actions to limit Ricks' right to earn acreage under the Exploration Agreement have been undertaken intentionally, maliciously[,] and in reckless and wanton disregard of" Cross Timbers' duty of good faith and fair dealing.  In resolving this claim, the district court first expressed doubt as to whether the Oklahoma courts would extend the duty of good faith and fair dealing to these types of contractual relationships.  *See* Dist. Ct. Order at 17 (citing *Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1519 (10th Cir. 1991) (refusing to impose non-contract-based duty of good faith and fair dealing upon co-tenants of an oil and gas lease)).  Even assuming the duty would extend to the circumstances present in this case, the district court concluded that the actions complained of here amounted to nothing more than alleged breaches of the Exploration Agreement

and that something more was necessary to support a claim of tortious breach of the implied covenant.

On appeal, Ricks asserts that the Oklahoma Supreme Court recently extended the reach of the tort to cover all contractual breaches that are malicious, intentional, or grossly negligent. *See Beshara v. S. Nat'l Bank*, 928 P.2d 280, 288 (Okla. 1996). It further alleged that it had come forward with sufficient evidence to create a question of fact as to whether Cross Timbers had acted intentionally and maliciously to deny Ricks the fruits of the Exploration Agreement. We need not, however, resolve the scope of the duty of good faith and fair dealing in Oklahoma. This claim is premised on many of the same allegations as the breach of fiduciary duty claim and suffers from the same infirmities. We therefore affirm the district court's grant of summary judgment for the same reasons set out above in resolving Ricks' fiduciary duty claim.

### 4. Interference With Prospective Economic Advantage

In its first amended complaint, Ricks alleged that "[b]y its intentional and malicious interference with Ricks' prospective contracts to sell gas produced from extended acreage, Cross Timbers has damaged Ricks." In an effort to resist Cross Timbers' motion for summary judgment on this claim, Ricks cited to paragraph seventeen of the affidavit of Art Swanson, Ricks' president, for the proposition that it had adduced evidence creating a material issue of fact as to whether the

actions of Cross Timbers had caused it to lose the opportunity to sell gas to its gas purchaser. The cited portion of Swanson's affidavit reads as follows:

> 17. Had Cross Timbers allowed Ricks to participate in the three wells now producing from the Council Grove formation in Sections 15 and 3, Ricks would be selling a substantial amount of gas from these wells to its gas purchaser. Ricks has lost the profit it would be earning on these gas contracts as a result of Cross Timbers' actions. By not allowing Ricks to develop acreage it rightfully owns under the Exploration Agreement, Cross Timbers' actions have reduced the volume of gas flowing through Ricks' system, thus diminishing the economic return to Ricks for the costs it has incurred for exploration activities, line expenses, compression and treating facilities.

The district court concluded that this evidence was insufficient to carry Ricks' burden of coming forward with evidence sufficient to create a material issue of fact as to whether Cross Timbers tortiously interfered with Ricks' prospective economic relations. According to the district court,

> Ricks' claim of commercial interference is mere speculation. Ricks does not provide the details of the gas purchase arrangement with which it claims Cross Timbers interfered and has not provided the information necessary to compute any damages. Further, Ricks has failed to connect Cross Timbers' conduct to any interference. The law allows a contracting party to engage in conduct to further its own legitimate business or financial interests. *Haynes v. South Community Hosp. Mgmt., Inc.*, 793 P.2d 303, 307 (Okla. App. 1990). The Court has examined Cross Timbers' conduct and finds in this case, this is exactly what occurred.

Ricks challenges on appeal the district court's grant of summary judgment in favor of Cross Timbers and asserts that "it is certain" that it was damaged when Cross Timbers refused to allow it to participate in the wells drilled in

-25-

sections 3 and 15. Unfortunately, there is not a single citation to the record in this section of Ricks' brief to support its assertion that material issues of fact exist precluding summary judgment on this claim. This failure is reason enough to affirm the district court. *See* Fed. R. App. P. 28(a)(9)(A) (providing that an appellant's opening brief "must contain[] appellant's contentions and the reasons for them, with citations to the . . . parts of the record on which appellant relies"); *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1213 (10th Cir. 2000).

In it reply brief, however, Ricks for the first time on appeal cites to paragraph 17 of Swanson's affidavit as the sole support for its contention that material issues of fact exist as to whether it was damaged by Cross Timbers' conduct with regard to sections 3 and 15. In light of this court's conclusion above that the Exploration Agreement provided Ricks with no rights to drill in sections 3 or 15, it is clear that Ricks cannot prove that it was damaged by Cross Timbers' refusal to allow it to participate in the drilling activities as regards those two sections. *See generally Gaylord v. Entm't Co. v.*

*Thompson*, 958 P.2d 128, 149-150 nn.96-97 (Okla. 1998) (citing with approval to Michigan cases which set out the elements of tort of intentional interference with prospective economic relations; those cases hold that damages resulting from the allegedly unfair or unlawful activity is one such element); *see also Koch*, 203 F.3d at 1212 ("This court has held that failure of proof of an essential element renders all other facts immaterial."). Accordingly, the district court properly granted summary judgment in favor of Cross Timbers on Ricks' claim of intentional interference with prospective economic advantage.

## C. Costs

In appeal number 00-6075, Ricks notes that Cross Timbers was awarded costs as a prevailing party under Federal Rule of Civil Procedure 54(b). Ricks further asserts that if this court were to reverse the district court in appeal number 99-6370, the order taxing costs must also be reversed because Cross Timbers will no longer be the prevailing party. As this court has affirmed the district court's grant of summary judgment in favor of Cross Timbers in the underlying appeal, the district court's order taxing costs is also affirmed.

## V. CONCLUSION

For the reasons stated above, the district court's orders granting summary judgment in favor of Cross Timbers and awarding it costs as a prevailing party are hereby **AFFIRMED**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge

15

22

27 26

34 35

3